UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRUCE L. FULLER,<br><br>        Plaintiff,<br><br>    v.<br><br>C. RIPPETOE, et al.,<br><br>        Defendants. | Case No. 14-cv-00304-HSG<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' SUMMARY JUDGMENT MOTION; REFERRING CASE TO SETTLEMENT PROCEEDINGS; STAYING AND ADMINISTRATIVELY CLOSING CASE; INSTRUCTIONS TO CLERK**<br><br>Re: Dkt. No. 52 |

**INTRODUCTION**

Plaintiff, an inmate at Kern Valley State Prison ("KVSP"), filed the instant *pro se* civil rights action pursuant to 42 U.S.C. § 1983 alleging that when he was previously housed at Pelican Bay State Prison ("PBSP"), Officers Rippetoe, Rexford, Evans, McMahan, and Schaad ("Defendants") used excessive force on him in violation of the Eighth Amendment. Now before the Court is Defendants' motion for summary judgment. Docket No. 52. Plaintiff has not filed a response despite being granted a ten-month extension of time via five separate extensions of time (Docket Nos. 67, 70, 73, 77, 79).[1] Defendants have filed a reply. Docket No. 74. For the reasons

---

[1] Based on the record before the Court, the Court concludes that no further extensions of time are warranted and that the motion is ripe for review. In requesting extensions of time, Plaintiff has alleged that he has been prevented from filing a response by KVSP officials. Plaintiff alleges that KVSP officials have retaliated against him for filing this action by denying him access to the law library, subjecting him to harassment, and destroying his documents. Docket Nos. 67, 70, 73, 77, and 79. Plaintiff also claims that he prepared an opposition and attempted to send it on January 4, 2016, but that KVSP officials confiscated that opposition on January 7, 2016. However, Plaintiff's allegations that he has been denied law library access are called into question by the law library log book which indicates that Plaintiff accessed the law library ten times in July and August 2015, with each visit lasting, on average, between an hour to two hours. Docket No. 75 ("Santiago Decl."), ¶ 5, Ex. B. This directly contradicts Plaintiff's assertion in a letter filed on

1  discussed below, Defendants' motion for summary judgment is GRANTED IN PART AND

2  DENIED IN PART.

## FACTUAL BACKGROUND[2]

**A.    June 4, 2013 Incident**

On June 4, 2013, at approximately 10:05 a.m., on the A Facility exercise yard, two inmates violently attacked inmate Johnson. Docket No. 1 ("Compl.") at 3; Rexford Decl. ¶ 2; Rippetoe Decl. ¶ 3; Evans Decl. ¶ 3; McMahan Decl. ¶ 2; Schaad Decl. ¶ 2; and Loftin Decl. ¶ 2. Prison guards shouted orders for the inmates to get down, which were ignored. Rexford Decl. ¶ 2; Rippetoe Decl. ¶ 3; Evans Decl. ¶ 3; McMahan Decl. ¶ 2; Schaad Decl. ¶ 2; and Loftin Decl. ¶ 2. A number of prison officers, including Defendants, began moving towards the incident. As Defendants approached the fight, they observed Plaintiff and two other inmates run towards the incident and join in the fight. Rexford Decl. ¶ 2; Rippetoe Decl. ¶ 3; Evans Decl. ¶ 3; McMahan Decl. ¶ 2; and Schaad Decl. ¶ 2. To stop the incident, Officer Schaad and Officer Rippetoe each deployed a pepper-spray grenade,[3] both of which landed near the fighting inmates. Rexford Decl.

---

September 3, 2015, that he had only accessed the law library on two occasions from May thru September 2015, Docket No. 71, and his assertion in a letter filed on September 10, 2015, that he had not spent a full hour in a prison law library for almost two years, Docket No. 72. In addition, Plaintiff's allegation that the destruction and confiscation of his legal materials prevented him from filing his opposition is called into question by his filings in June, July, and December 2015 in an unrelated case, *Fuller v. Barnes (Biter)*, No. CV 14-00977 CJC (VBK), C.D. Cal., which indicate that he was capable of filing legal documents despite purportedly being deprived of his legal materials. *See* Docket No. 81 at 2–4; Docket No. 82. The Court GRANTS Defendants' request for judicial notice of those court filings:
1. Motion for Reconsideration due to Misapplication of Law and Rule, *Fuller v. Barnes (Biter)*, No. CV 14-00977 CJC (VBK) (C.D. Cal. Jun. 8, 2015)
2. In Response (sic) to the Order Denying the Petitioner's Motion for Reconsideration Citing Rule 59(e), *Fuller v. Barnes (Biter)*, No. CV 14-00977 CJC (VBK) (C.D. Cal. July 23, 2015)
3. The Petitioner Is Indeed Entitled to Relief Per Federal Rule 59, *Fuller v. Barnes (Biter)*, No. CV 14-00977 CJC (VBK) (C.D. Cal. Dec. 7, 2015)

A district court "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue." *Bias v. Moynihan*, 508 F.3d 1212, 1225 (9th Cir. 2007) (internal quotation marks and citations omitted) (granting request to take judicial notice in § 1983 action of five prior cases in which plaintiff was *pro se* litigant, to counter her argument that she deserved special treatment because of her *pro se* status).

[2] The facts are undisputed unless otherwise noted.

[3] Defendants refer to the pepper-spray grenade by its more technical name: Oleoresin Capsicum Instantaneous Blast grenade, or "OC" grenade.

¶ 3; Rippetoe Decl. ¶ 4; Evans Decl. ¶ 3; McMahan Decl. ¶ 2; and Schaad Decl. ¶ 2. In response to the deployment of the two grenades, the six inmates involved in the fight separated and began to assume prone positions on the ground. Rexford Decl. ¶ 3; Rippetoe Decl. ¶ 4; Evans Decl. ¶ 3; McMahan Decl. ¶ 2; and Schaad Decl. ¶ 2. The parties disagree as to what happened next.

**Plaintiff's Allegations.** Plaintiff alleges that, while he was lying prone on the floor and not engaged in any aggressive behavior, Defendants deployed a pepper-spray grenade next to his face which caused him to jump up and run from the pepper spray. Compl. at 3 and Docket No. 1-1 at 16. The pepper spray left Plaintiff with blurred vision; and he currently experiences a burning sensation, puffiness, and redness in both eyes caused by the pepper spray. Compl. at 3 and Docket Nos. 1-1 at 16, 1-3 at 47. The injury to Plaintiff's eyes is ongoing and often interrupts his daily activities. *Id.*

After the inmates were cuffed and led to the holding-cell area, Plaintiff informed Lt. Amis that the use of the third pepper-spray grenade constituted unconstitutional excessive force. Docket No. 1-1 at 8 and 16. Lt. Amis did not return to make a video of Plaintiff's excessive force claim, which Plaintiff alleges is mandatory, and Plaintiff was taken directly to administrative segregation. Docket No. 1-1 at 8. Later, prison officials edited video footage and mishandled photographic evidence in order to cover up their use of excessive force. Docket No. 1-3 at 28 and 33. Plaintiff was found guilty of participating in a riot, despite his assertion that he was never positively identified as a participant in the fight. Docket No. 1-3 at 17–34.

**Defendants' Allegations.** Defendants allege that the additional grenades were deployed because Plaintiff jumped to his feet and ran away from the incident area and toward the pedestrian gate. Rexford Decl. ¶ 3; Rippetoe Decl. ¶ 4; and Schaad Decl. ¶ 3. When Plaintiff jumped up, Officer Schaad shouted at Plaintiff to get down and attempted to strike Plaintiff with an expandable baton. Schaad Dec. ¶ 3. After Plaintiff jumped up, Inmate Jackson also got up from his prone position and ran towards the pedestrian gate. Evans Decl. ¶ 5. Officer Rexford deployed a chloroacetpohene (CN) Han-Ball grenade, which landed approximately five feet from Plaintiff. Rexford Decl. ¶ 3; Rippetoe Decl. ¶ 4; Evans Decl. ¶ 3; McMahan Decl. ¶ 2; and Schaad Decl. ¶ 2. Officer Evans deployed a pepper-spray grenade shortly thereafter. Evans Decl. ¶ 5.

1   Following the deployment of the additional grenades, Plaintiff and Fuller resumed prone positions.
2   Rexford Decl. ¶ 3; Rippetoe Decl. ¶ 4; Evans Decl. ¶ 3; McMahan Decl. ¶ 2; and Schaad Decl. ¶ 2.
3   No further chemical agents were deployed.

4       The responding officers handcuffed the prisoners who participated in the fight. Officers took identifying photographs and video of the inmates to document the incident as required by the California Code of Regulations. These photographs and videos were submitted and memorialized as part of the Crime/Incident Report for the incident, institutional log number PBSP-FAYD-13-16-0239. The inmates involved in the incident were Plaintiff, Burns, Gaddy, Jackson, Jones, and Hayes;[4] and inmate Johnson was the victim. Docket No. 1-2 at 48.

    Correctional Officer Loftin placed Plaintiff into handcuffs, retrieved Plaintiff's state identification from his left sock, and escorted Plaintiff to the A Facility hobby shop. Schaad Decl. ¶ 4; Loftin Decl. ¶ 3. Both Officers Schaad and Loftin observed that Plaintiff was not in any particular distress, and did not appear to be suffering any negative effects from the chemical agents. Schaad Decl. ¶ 4; Loftin Decl. ¶ 3. Plaintiff was twice offered the opportunity to decontaminate from the effects of the chemical agents, and he declined both times. Schaad Decl. ¶ 4; Loftin Decl. ¶ 3. Once in the holding cell, Plaintiff received a medical examination from psychiatric technician K. Bragger. Security squad officer J. Hernandez took two evidentiary photographs of Plaintiff at this time. Hernandez Decl. ¶ 3; Schaad Decl. ¶ 4. Officer Hernandez also observed that Plaintiff did not appear to be in any physical distress or to be suffering physical symptoms normally associated with exposure to pepper spray, such as tearing eyes that are difficult to keep open, nasal discharge, difficulty breathing, or coughing. Hernandez Decl. ¶ 4.

**A.**  **<u>Medical Treatment</u>**

    On June 4, 2013, Plaintiff was examined just after the incident. The medical notes report that the pepper spray hit Plaintiff on the upper right side of his head. Docket No. 1-3 at 46. The medical notes indicate that Plaintiff had no injuries. While in the holding-cell area, Plaintiff was twice asked if he wanted to decontaminate after being exposed to the pepper spray, and he

---

[4] Inmate Hayes was identified as participating in the riot because he approached the incident after all other uninvolved inmates were down. Docket No. 1-3 at 44.

declined. Loftin Decl. ¶ 3; Schaad Decl. ¶ 4.

On June 5, 2013, Plaintiff submitted a request for health care services, stating that, due to his pepper spray exposure, his eyes were burning and his left eye kept running. Docket No. 1-3 at 47. On June 15, 2013, Plaintiff submitted another request for health care services, stating that his eyes were still burning and that he now suffered from blurry vision. Docket No. 1-3 at 49. On July 18, 2013, Plaintiff submitted another request for health care services, stating that his eyes were still burning and asking to see an eye doctor. Docket No. 1-3 at 52. In response, Plaintiff was examined by a nurse who prescribed eye drops and attributed blurry vision to a need for reading classes. Docket No. 61-7 at 7. On July 27, 2013, Plaintiff submitted another request for health care services, stating the eyedrops had been ineffective, and that he continued to suffer from blurry vision and a burning sensation in both eyes. Docket No. 1-3 at 54. In response, Plaintiff was again examined by a nurse on July 29, 2013. Docket No. 61-7 at 13. The nurse concluded that there were no abnormalities in Plaintiff's eyes, including no tearing or discharge. Docket No. 61-7 at 13.

On August 5, 2013, Plaintiff submitted another request for health care services, stating that he continued to suffer from blurry vision and a burning sensation in both eyes. Docket No. 1-3 at 55. Plaintiff was examined by a nurse on August 6, 2013, who again noted no abnormalities in Plaintiff's eyes, including no tearing or discharge. Docket No. 61-7 at 17.

On August 13, 2013, Plaintiff submitted another request for health care services, stating that he continued to suffer from blurry vision and a burning sensation in both eyes and again demanding to see an eye doctor. Docket No. 1-3 at 56. Plaintiff was examined by a doctor on August 15, 2013. Docket No. 61-7 at 23. The doctor noted that despite Plaintiff's complaint of blurred vision and burning in both eyes, Plaintiff's eyes had no tearing and Plaintiff squinted his eyes very narrowly when the doctor attempted to examine his eyes. Docket No. 61-7 at 23. The doctor also noted that when Plaintiff was engaged in casual conversation with the correctional officer, he did not blink frequently or stare, but rather looked around the room with eyes wide open. Docket No. 61-7 at 23. The doctor recommended artificial tears and cool compresses for the eye irritation. Docket No. 61-7 at 23. The doctor concluded that there were no objective

findings to support eye irritation. Docket No. 61-7 at 28.

On September 5, 2013, Plaintiff submitted another request for health care services, stating that he had run out of eye drops, that continued to suffer from blurry vision and a burning sensation in both eyes, and that he could no longer see far distances. Docket No. 1-3 at 57. On September 16, 2013, Plaintiff submitted another request for health care services, stating that his request for a refill of his eye drops had not been filled. Docket No.1-3 at 58. He stated that he continued to suffer from blurry vision and a burning sensation in both eyes, and that the eye drops addressed the burning sensation, but not the blurriness. Docket No. 1-3 at 58. On September 17, 2013, Plaintiff was examined by a nurse who did not observe any redness or discharge in Plaintiff's eyes. Artificial tears were again prescribed. Docket No. 61-7 at 27. The next day, Plaintiff was examined by a prison doctor who also noted that Plaintiff's eyes did not have any apparent tearing or redness. Docket No. 61-7 at 29.

On October 6, 2013, Plaintiff submitted another request for health care services, complaining that he continued to suffer from blurry vision, and requesting to see an eye doctor. Docket No. 1-3 at 59. Plaintiff was examined twice in October by medical professionals and prescribed eye drops.

On October 22, 2013, Plaintiff again submitted a request for health care services. Docket No. 61-7 at 45. He complained that he had been suffering burning sensations in his eyes and blurry vision for over five months without effective medical treatment. Docket No. 61-7 at 45. A November 6, 2013 medical examination indicated that Plaintiff's eyes were not actively tearing or watering, and that Plaintiff was not blinking excessively. Docket No. 61-7 at 46.

On December 2, 2013, Plaintiff again submitted a request for health care services. Docket No. 1-3 at 60. He complained that his vision remained blurry; that he was now near-sighted and unable to see clearly beyond 15 to 20 feet; and that he now suffered from headaches which required pain pills to manage. Docket No. 1-3 at 60.

Plaintiff claims that he continues to suffer blurred vision caused by the pepper spray; and he experiences a burning sensation, puffiness, and redness in both eyes, also caused by the pepper spray. Compl. at 3 and Docket Nos. 1-1 at 16, 1-3 at 47.

**DISCUSSION**

I.  **Standard of Review**

Summary judgment is proper where the pleadings, discovery, and affidavits show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See id.*

The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The burden then shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *See id.* at 324 (citing Fed. R. Civ. P. 56(e) (amended 2010)). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. See Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324.

For purposes of summary judgment, the court must view the evidence in the light most favorable to the nonmoving party; if the evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence submitted by the nonmoving party. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999). The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv., Inc*, 809

F.2d at 630. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

## II.     Eleventh Amendment Immunity for Official-Capacity Claims

Defendants correctly argue that they are entitled to Eleventh Amendment immunity with respect to Plaintiff's official-capacity claims. Docket No. 52 at 17–18. Defendants are employees of a state agency, the California Department of Corrections and Rehabiliations. Official capacity suits against Defendants are therefore suits against the state, *see Kentucky v. Graham*, 473 U.S. 159, 169–70 (1985) (suit against a state official in his official capacity is not a suit against the official but rather a suit against the official's office, i.e., the state) and barred by the Eleventh Amendment, *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 237–38 (1985) (Eleventh Amendment bars from the federal courts suits against a state by its own citizens). Accordingly, the Court GRANTS summary judgment in favor of Defendants with respect to Plaintiff's official-capacity claims.

## III.    Excessive Force Claim

### A.     Legal Standard

The treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment. *Helling v. McKinney*, 509 U.S. 25, 31 (1993). "After incarceration, only the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (ellipsis in original) (internal quotation and citation omitted). A prison official violates the Eighth Amendment when two requirements are met: (1) the deprivation alleged must be, objectively, sufficiently serious, *Farmer v. Brennan*, 511 U.S. 824, 834 (1994) (citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)), and (2) the prison official possesses a sufficiently culpable state of mind, i.e., the offending conduct was wanton, *id.* (citing *Wilson*, 501 U.S. at 297); *LeMaire v. Maass*, 12 F.3d 1444, 1451 (9th Cir. 1993).

What is required to establish an unnecessary and wanton infliction of pain varies according

8

to the nature of the alleged constitutional violation. *Whitley*, 475 U.S. at 320. When prison officials are accused of using excessive force in violation of the Eighth Amendment, the core judicial inquiry is whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992). In determining whether the use of force was for the purpose of maintaining or restoring discipline, or for the malicious and sadistic purpose of causing harm, a court may evaluate the need for application of force, the relationship between that need and the amount of force used, the extent of any injury inflicted, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response. *Hudson*, 503 U.S. at 7; *see also Spain v. Procunier*, 600 F.2d 189, 195 (9th Cir. 1979) (guards may use force only in proportion to need in each situation). Courts must accord prison administrators wide-ranging deference in the adoption and execution of policies and practices to further institutional order and security. *Jeffers v. Gomez*, 267 F.3d 895, 917 (9th Cir. 2001) (according deference to prison officials in rejecting Eighth Amendment claim against director of state prison system and prison warden for insufficient storage of non-lethal weapons, and inadequate emergency plans).

**B.   Analysis**

    **1.   Officer McMahan**

Plaintiff claims that excessive force was used against him when a pepper-spray grenade exploded near his face. Compl. at 3. However, it is undisputed that Officer McMahan did not deploy any grenade during this incident. McMahan Decl. ¶ 3. Plaintiff does not make any other allegations of excessive force by Officer McMahan.

Section 1983 creates a cause of action based on personal participation by a defendant. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("Liability under section 1983 arises only upon a showing of personal participation by the defendant."). A person deprives another "of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).

Here, Defendants have made a showing that Officer McMahan did not engage in throwing

the pepper-spray grenade that allegedly caused injury to Plaintiff's eyes, and that Officer McMahan was merely one of the many officers who responded to the scene. Plaintiff has not addressed this showing in any way. Accordingly, summary judgment is GRANTED in favor of Officer McMahan.

### 2. Officers Rexford, Rippetoe, Schaad, and Evans

Plaintiff does not dispute that he was engaged in the assault on inmate Johnson, nor does he dispute Defendants' allegation that the deployment of the first two grenades was necessary to restore discipline and order. Nor does Plaintiff dispute that he stood up from a prone position. Whether Defendants engaged in excessive force turns on when and why Defendants deployed the third grenade. If, as they claim, Defendants deployed the third pepper-spray grenade *after* Plaintiff stood up, to ensure order and discipline and subdue an inmate who had just participated in an assault, was not subdued by the deployment of two pepper-spray grenades, and was now running away from the incident, those facts would support the conclusion that the force used was not excessive. If, as Plaintiff claims, he was needlessly pepper-sprayed while he was lying prone and still on the ground after prison officials had restored order and discipline, and jumped to his feet in response to the pepper-spray grenade, those facts would support the conclusion that the force used was excessive.

In support of their version of events, Defendants provide surveillance video of the incident, Docket No. 60 ("Hernandez Decl."), Ex. B, and declarations from Officers Rexford, Rippetoe, and Schaad stating that they saw Plaintiff jump to his feet from a prone position and run away from the incident, Rexford Decl. ¶ 3; Rippetoe Decl. ¶ 4; and Schaad Decl. ¶ 3. In support of his version of events, Plaintiff provides declarations from inmates Gaddy, Burns and Jackson, all of whom were involved in the incident. Docket No. 1-1 at 16 and Docket No. 8 at 4–7. Plaintiff also claims that the video footage was edited to cover up the use of excessive force, though he does not specify how the video footage was edited. Docket No. 1-3 at 28 and 33.

As noted above, in determining whether summary judgment is appropriate, the Court must draw all reasonable inferences in favor of the party opposing summary judgment. *See Leslie*, 198 F.3d at 1158. Where there is video footage of the events at issue, however, the Court is not

required to accept Plaintiff's version of events if it is clearly contradicted by the video footage, so long as there is no dispute about whether the video footage accurately reflects what actually occurred. *Scott v. Harris*, 550 U.S. 372 (2007).

In *Scott*, the plaintiff had attempted to flee in his car and the defendant police officer had ultimately rammed plaintiff's car from behind in order to apprehend the individual, resulting in a crash that left the plaintiff a quadriplegic. *Id.* at 374. In response to the defendant's request for summary judgment on the plaintiff's excessive force claim, the plaintiff asserted that he was not endangering the public when he fled in his car because there were few pedestrians and he mainly remained in control of his vehicle. *Id.* at 379. While the district court and the court of appeals found that there were fact questions as to qualified immunity and the underlying constitutional violation, the Supreme Court concluded that the lower courts had erred because there was video footage of the chase that "quite clearly contradict[ed] the version of the story told by the plaintiff." *Id*. at 378. In light of the video, the Court held, no reasonable jury could have accepted the plaintiff's version of events. *Id.* at 380–81.

*Scott* does not change the requirement that the court must draw all reasonable inferences in favor of the party opposing summary judgment, but simply makes clear that this rule does not require the court to draw inferences that are so clearly contradicted by video footage that no reasonable jury could accept them. Defendants provide video footage of the incident from five different cameras. The footage does not clearly contradict Plaintiff's account on the pivotal question: was the third grenade deployed before or after Plaintiff got up? The video footage from camera #3 and camera #8 was taken from too far away to provide a clear view of what happened. In the video footage from camera #6, it looks like two grenades are deployed between 10:09:09 am and 10:09:11 am, but it is unclear because the grenades appear to bounce and send out smoke with each bounce, making it hard to distinguish between the deployment of a new grenade and the bouncing of an already-deployed grenade. In the video footage from camera #6 and camera #7, Plaintiff stood up from the prone position at 10:09:22 a.m. but he was obscured by smoke, and the Court cannot determine conclusively if that smoke was from the first two grenades or from a third grenade, as Plaintiff alleges. The video footage from camera #7 does show a grenade deployed

after Plaintiff stood up, at around 10:09:29 a.m., but it is unclear if that was the third grenade deployed to gain control of the incident, as Defendants contend, or the fourth grenade deployed, consistent with Plaintiff's version of events. In the video footage from camera #8, when Plaintiff stood up from the prone position, he was obscured by smoke, and he quickly left the frame. In summary, the video footage does not provide a sufficiently definitive record of when and why the third grenade was deployed, and it thus does not provide a basis for removing from the jury the question of whether the force used against Plaintiff was reasonable. That inquiry will require evaluating the credibility of inmate-witnesses, Plaintiff, Defendants, and anyone who testifies regarding the video footage (for example, any testimony as to how to visually determine when pepper-spray grenades are deployed). Summary judgment is not the time for credibility determinations. *Blankenhorn v. City of Orange*, 485 F.3d 463, 470 (9th Cir. 2007) ("'[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[]'") (citing *Anderson*, 477 U.S. at 255). Summary judgment therefore is not appropriate with respect to Officers Rexford, Rippetoe, Schaad, and Evans.

### C. Qualified Immunity

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court set forth a two-pronged test to determine whether qualified immunity exists. First, the court asks: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* at 201. If no constitutional right was violated if the facts were as alleged, the inquiry ends and defendants prevail. *See id*. If, however,

> a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. . . . The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. . . . The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.

1  *Id.* at 201–02 (internal quotation marks and citations omitted).  Although *Saucier* required courts
2  to address the questions in the particular sequence set out above, courts now have the discretion to
3  decide which prong to address first, in light of the particular circumstances of each case.  *See*
4  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

5        At the time of the June 4, 2013 incident, it was well-settled that the Eighth Amendment
6  prohibits prison officials from wantonly beating an inmate who is not resisting.  *See Hudson*, 503
7  U.S. at 6 (noting that, in determining whether a prison official used excessive force, "the core
8  judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore
9  discipline, or maliciously and sadistically to cause harm"); *Martinez v. Stanford*, 323 F.3d at 1178,
10  1180, 1183–84 (9th Cir. 2003) (finding that prison officials were not entitled to qualified
11  immunity where the inmate alleged that the officials tasered him despite his lack of resistance and
12  then, after handcuffing him, kicked his shoulder and hit him with a baton).  On January 17, 2013,
13  the Ninth Circuit recognized that "it is a violation of the Eighth Amendment for prison officials to
14  use mace, tear gas or other chemical agents in quantities greater than necessary or for the sole
15  purpose of infliction of pain."  *Furnace v. Sullivan*, 705 F.3d 1021, 1028 (9th Cir. 2013) (internal
16  quotation marks and citations omitted) (denying qualified immunity to a prison guard because the
17  right to be free from excessive use of pepper spray was clearly established).  The Court finds that
18  at the time of the incident the law was clearly established that the use of pepper spray against an
19  individual who has been subdued constitutes excessive force.

20        If believed by a trier of fact, Plaintiff's account of the incident would support the
21  conclusion that Plaintiff's Eighth Amendment rights were violated when Officers Rexford,
22  Rippetoe, Schaad, and Evans deployed a pepper-spray grenade near his face when Plaintiff was
23  complying with their orders and not resisting.  Therefore, qualified immunity is denied as to
24  Officers Rexford, Rippetoe, Schaad, and Evans.

**CONCLUSION**

26        For the foregoing reasons, the Court orders as follows:
27        1.      The Court GRANTS summary judgment in favor of Officer McMahan.  Officer
28  McMahan is DISMISSED from this action with prejudice.  The Court also GRANTS summary

judgment in favor of Defendants with respect to Plaintiff's official-capacity claims. Plaintiff's official-capacity claims are DISMISSED with prejudice.

2. The Court DENIES Officers Rexford, Rippetoe, Schaad, and Evans' motion for summary judgment with respect to Plaintiff's individual-capacity claims.

3. The instant case is REFERRED to Judge Vadas pursuant to the Pro Se Prisoner Settlement Program for settlement proceedings. The proceedings shall take place within ninety (90) days of the filing date of this order. Judge Vadas shall coordinate a time and date for a settlement conference with all interested parties or their representatives and, within ten (10) days after the conclusion of the settlement proceedings, file with the court a report regarding the prisoner settlement proceedings.

The Clerk shall send Magistrate Judge Vadas a copy of this order.

4. Other than the settlement proceedings ordered herein, and any matters Magistrate Judge Vadas deems necessary to conduct such proceedings, this action is hereby STAYED until further order by the Court following the resolution of the settlement proceedings. The Clerk shall ADMINISTRATIVELY CLOSE this case until further order of the Court.

This order terminates Docket No. 52.

**IT IS SO ORDERED.**

Dated: 8/8/2016

HAYWOOD S. GILLIAM, JR.
United States District Judge

14